# In the United States Court of Federal Claims

No. 21-1387
(Filed under seal: January 18, 2022)
(Reissued for Publication: March 10, 2022)[1]

```
*****************************************
CROWLEY GOVERNMENT SERVICES,        *
INC.,                                *
                                     *
            Plaintiff,               *
                                     *
v.                                   *        Bid Protest; Motion for Judgment
                                     *        on the Administrative Record;
                                     *        Incumbent Preference; Incumbent
THE UNITED STATES,                   *        Advantage; Unstated Evaluation
                                     *        Criteria; Misleading Discussions.
            Defendant,               *
                                     *
and                                  *
                                     *
                                     *
PATRIOT CONTRACT SERVICES, LLC,      *
                                     *
            Defendant-Intervenor.    *
                                     *
*****************************************
```

*James Y. Boland* and *Christopher Griesedieck*, Venable, LLP, Vienna, VA, for Plaintiff.

*William James Grimaldi*, Senior Trial Attorney, U.S. Department of Justice, Civil Division, Washington, DC, with *Robert D. Young*, Supervisory Associate Counsel, Military Sealift Command, of counsel, and *Johanna Crawford*, Associate Counsel, Military Sealift Command, of counsel, for Defendant.

*Craig S. King*, *Richard J. Webber*, and *Travis L. Mullaney*, Arent Fox LLP, Washington, DC, for Defendant-Intervenor.

---

[1] This Order and Opinion was filed under seal on January 18, 2022, *see* ECF No. 26, in accordance with the Protective Order entered on May 26, 2021, *see* ECF No. 13. The parties were given an opportunity to identify protected information, including source selection information, propriety information, and confidential information for redaction. The parties filed a notice proposing redactions on February 1, 2022. *See* ECF No. 28. As explained in the Memorandum Opinion and Order, *see* ECF No. 29, contemporaneously filed with this public version of the Order and Opinion, the Court has accepted the parties' proposed redactions. All redactions are indicated by bracketed asterisks, *e.g.*, "[* * *]."

# ORDER AND OPINION

**DIETZ, Judge.**

Plaintiff, Crowley Government Services, Inc. ("Crowley"), protests a decision by the Military Sealift Command ("MSC") to award a contract for operation and maintenance of several WATSON Class ships to the incumbent contractor, Patriot Contract Services, LLC ("Patriot"). Crowley challenges MSC's proposal evaluation by arguing that MSC improperly favored Patriot due to its incumbent status. Because the Court finds that MSC's proposal evaluation was based on the evaluation criteria set forth in the solicitation and supported by the contents of Patriot's proposal, Crowley's motion for judgment on the administrative record is denied, and the government's and Patriot's respective motions for judgment on the administrative record are granted.

## I.    BACKGROUND

### A.    Overview of the Solicitation and Evaluation Factors

MSC issued a solicitation for the operation and maintenance ("O&M") of eight government-owned large, medium-speed roll on/roll off vessels ("LMSR"), collectively referred to as the WATSON Class LMSR vessels. Admin. R. 257, ECF No. 17 [hereinafter AR]. The solicitation called for a competitively negotiated source selection conducted in accordance with Part 15 of the Federal Acquisition Regulation ("FAR"). AR 3907. The government intended to award a firm-fixed price contract with a one-year base period and four one-year option periods. AR 3908. The solicitation required submission of a proposal in three volumes: Solicitation Package, Technical Proposal, and Past Performance Proposal. AR 491. The Solicitation Packages submitted by Crowley and Patriot are not at issue in this protest.

Section M of the solicitation stated that the "award will be made to a responsible offeror whose offer . . . represents the best value to the [g]overnment after considering the evaluation factors in this solicitation[,]" and further stated that MSC "will evaluate offers on a trade-off basis in accordance with FAR 15.101-1."[2] AR 503. To determine best value, Section M stated that MSC would conduct a trade-off analysis of three factors: Technical, Past Performance, and Price. *Id.* Section M explained that the Technical and Past Performance factors are "approximately equal" and "[w]hen combined . . . are significantly more important than cost or price." *Id.* Nonetheless, "[t]he importance of price will increase . . . when differences in the evaluated quality of proposals decreases, or . . . when price is so high it diminishes the value of non-cost factors to the [g]overnment." *Id.*

The Technical Factor comprised of two subfactors—Technical Management Approach and Manning Approach. AR 506. However, the solicitation explained that the "entire Technical [F]actor will be evaluated as a single technical factor." *Id.* The solicitation provided that "the [g]overnment will consider the [t]echnical proposal submitted by the offeror in evaluating this

---

[2] FAR 15.101-1 states that a "tradeoff process is appropriate when it may be in the best interest of the [g]overnment to consider award to other than the lowest priced offeror or other than the highest technically rated offeror."

factor." *Id*. The solicitation went on to specify areas of interest to the government under each subfactor. *Id*. For the Technical Management Approach, the solicitation provided four areas of interest. *Id*. The Manning Approach consisted of seven areas of interest. *Id*. The solicitation provided that the entire Technical Factor would be evaluated using one of five adjectival ratings: "Outstanding," "Good," "Acceptable," "Marginal," or "Unacceptable." AR 507.

The Past Performance Factor "assess[ed] the [g]overnment's confidence in the offeror's likelihood of success in performing the solicitation's requirements as indicated by that offeror's record of relevant past performance." AR 507. As part of the past performance proposal, each offeror was required to provide "up to five [g]overnment reference contracts that are on-going or have been completed within five years of issuance of th[e] solicitation or final amendment . . . that demonstrates its experience successfully operating ship(s) similar to the ship(s) described in the [solicitation]." AR 499. If the offeror did not have a government reference contract available, the solicitation stated, "commercial contracts may be used . . . . However, government contracts will be deemed more relevant." AR 500. The solicitation instructed offerors to "specifically address how the referenced contracts reflect quality performance pertinent to the solicitation requirements" in their past performance narrative. *Id*. In addition to the narrative, offerors were required to "provide a point of contact and the contact's email and phone number" for each submitted reference contract. *Id.*

For the past performance evaluation, the solicitation provided that an offeror's past performance effort would be evaluated only if it was deemed to be "recent," meaning it must have been completed within five years of the solicitation's close date, as amended. AR 507. Past performances that were determined to be recent would also be assessed for relevance. *Id.* The solicitation stated that "[c]ontracts that are most similar . . . in terms of scope, complexity, and magnitude will be considered most relevant."[3] *Id.* For the relevancy assessment, each past performance effort would be graded on a scale of: "Very Relevant," "Relevant," "Somewhat Relevant," or "Not Relevant." AR 508. The weight given to a particular past performance effort would depend on how relevant it was to the solicitation requirements. *See* AR 4404. The Past Performance Evaluation Team ("PPET") was tasked with evaluating proposals and assigning adjectival ratings. AR 507. Based on the totality of all past performance efforts, an overall Past Performance Confidence rating would be assigned using one of five adjectival ratings: "Substantial Confidence," "Satisfactory Confidence," "Neutral Confidence," "Limited Confidence," or "No Confidence." AR 508-09.

## B. The Evaluation, Award Decision and Protest

MSC received six proposals, including those from Crowley and Patriot. AR 3163-64. MSC conducted two rounds of discussions, three rounds of Final Proposal Revisions ("FPR"), and one round of clarifications to obtain acceptable proposals from offerors in the competitive

---

[3] The solicitation defined "scope" as "[e]xperience operating, manning, and maintaining a similar number of ship(s) with a similar mission[;]" "complexity" as the "[s]imilarity of technical difficulty, managerial complexity, and/or required coordination of efforts and disciplines performed by the offeror and any subcontractors to the requirements outlined in the solicitation[;]"and "magnitude" as "[t]he measure of the similarity of the volume, dollar value and duration of the work actually performed under the offeror's submitted contracts[.]" AR 508.

range. AR 3774. The Source Selection Evaluation Board ("SSEB") evaluated each proposal based on the FPRs and documented the results in the SSEB Reports. AR 3171-74, 3342-436, 3539-62. Crowley and Patriot each received an "Outstanding" rating for the technical trade-off factor, which means that each proposal indicates an exceptional approach and understanding of the requirements, contains multiple strengths, and has a low risk of unsuccessful performance. AR 507, 3702, 3710. For the past performance trade-off factor, Crowley received a rating of "Satisfactory Confidence," which means that the government has a reasonable expectation that the offeror will successfully perform the required effort based on the offeror's recent and relevant performance record. AR 508, 3440. Patriot received a rating of "Substantial Confidence," which means that the government has a high expectation that the offeror will successfully perform the required effort based on the offeror's recent and relevant performance record. AR 508, 3463, 3710.[4]

The SSEB presented its findings to the Source Selection Advisory Council ("SSAC"). AR 3702. After its review, the SSAC issued a memorandum with additional findings to the Source Selection Authority ("SSA"). AR 3700-43. The SSA performed an independent review of the proposals and described his evaluation process and decision in the Source Selection Decision Document ("SSDD"). AR 3744-53. In the SSDD, the SSA concurred with the SSEB and SSAC findings and recommendation and concluded "that [the] award should be made to [Patriot]." AR 3742-43, 3752-53.

On March 22, 2021, Crowley protested the evaluation and source selection at the Government Accountability Office ("GAO"). AR 4082-125. Before the GAO proceedings concluded, Crowley filed its complaint with this Court. The parties subsequently filed cross-motions for judgment on the administrative record, and oral argument was held on August 25, 2021. Crowley's protest is now ripe for decision.

## II.    LEGAL STANDARDS

The Tucker Act grants this Court jurisdiction to review post-award bid protests and render judgment on an action "by an interested party objecting to . . . a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement[.]" 28 U.S.C. § 1491(b); *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1330 (Fed. Cir. 2001). The Tucker Act's waiver of sovereign immunity "covers a broad range of potential disputes arising during the course of the procurement process[,]" including objections to an award. *Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1380-81 (Fed. Cir. 2012).

This Court reviews agency decisions in bid protests using the standard of review set forth in the Administrative Procedure Act ("APA"). 28 U.S.C. § 1491(b)(4); *Impresa*, 238 F.3d at 1332. This standard permits a court to set aside an agency's contracting decision if the protestor shows it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005). "Under an arbitrary or capricious standard, the reviewing court should not substitute its

---

[4] Crowley's total evaluated price was $460,647,335.29, and Patriot's total evaluated price was $455,164,761.90. AR 3710. However, their respective price proposals are not directly at issue in this protest.

judgment for that of the agency[] but should review the basis for the agency decision to determine if it was legally permissible, reasonable, and supported by the facts." *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 105 Fed. Cl. 541, 559 (2012) (citing *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The protestor has the burden to show by a preponderance of evidence the arbitrary and capricious nature of the agency's decision. *Mortg. Contracting Servs., LLC v. United States*, 153 Fed. Cl. 89, 124 (2021). While the APA standard calls for considerable deference to the agency, *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1058 (Fed. Cir. 2000), a court may set aside an agency's procurement decision if the decision lacked a rational basis, or the procurement procedure involved a violation of regulation or procedure. *Impresa*, 238 F.3d at 1332; *see also Safeguard Base Operations, LLC v. United States*, 989 F.3d 1326, 1343 (Fed. Cir. 2021). Nevertheless, if the reviewing court finds that the agency's action evinced rational reasoning and consideration of relevant factors, it must sustain the agency's action. *Advanced Data Concepts*, 216 F.3d at 1058 (citing *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974)).

## III.   DISCUSSION

In its protest, Crowley raises several challenges to MSC's proposal evaluation with an underlying premise that MSC improperly credited Patriot because of its incumbent status. First, Crowley argues MSC improperly assigned strengths to Patriot and failed to assign strengths to Crowley as part of the technical evaluation. Second, Crowley argues MSC treated Crowley and Patriot unequally in evaluating past performance. Third, Crowley argues MSC conducted misleading discussions in violation of FAR 15.306(d)(3).

While Crowley's challenges are extensive, the Court nevertheless finds that Crowley has failed to demonstrate that MSC improperly credited Patriot for its incumbency or that MSC's proposal evaluation was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. It is apparent from the record that MSC considered Patriot's incumbency during its proposal evaluation, but consideration of an offeror's incumbency does not, on its own, render an agency's decision arbitrary or capricious. This Court has long recognized that incumbent contractors may possess inherent competitive advantages, and those "natural" advantages are generally permissible. *Omega World Travel, Inc. v. United States*, 54 Fed. Cl. 570, 575 (2002); *see Worldwide Language Res., LLC v. United States*, 127 Fed. Cl. 125, 133 (2016); *Gulf Grp., Inc. v. United States*, 56 Fed. Cl. 391, 398 (2003); *Galen Med. Assocs., Inc. v. United States*, 56 Fed. Cl. 104, 111 (2003); *Comput. Scis. Corp. v. United States*, 51 Fed. Cl. 297, 311 (2002). While an agency may not unduly tip the scales in favor of an incumbent contractor, an agency is not required to ignore the benefits or advantages derived from an offeror's incumbency, and it likewise need not attempt to level the playing field for all other offerors. *Gulf Grp.*, 56 Fed. Cl. at 398; *Galen Med. Assocs.*, 56 Fed. Cl. at 111. As explained in the below analysis of each of Crowley's challenges, the record demonstrates that MSC's decision to select Patriot for award was based on the evaluation criteria set forth in the solicitation and supported by the contents of Patriot's proposal.

A.      **Technical Evaluation**

Crowley argues that MSC improperly credited Patriot for its incumbent status throughout the technical evaluation and, in doing so, employed unstated evaluation criteria. Pl.'s Mot. for J. on the Admin. R. at 7-8, ECF No. 18 [hereinafter Pl.'s MJAR]. "Government agencies are entrusted with a good deal of discretion in making procurement decisions." *Grumman Data Sys. Corp. v. Widnall*, 15 F.3d 1044, 1046 (Fed. Cir. 1994). In particular, the assignment of technical ratings by an agency is a discretionary determination that is part of the "minutiae of the procurement process[,]" and, as such, the Court typically will not second guess the agency's determination. *E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996). Furthermore, "[i]t is well established that the evaluation of proposals for their technical quality generally requires the special expertise of procurement officials," so "[r]eviewing courts therefore give the greatest deference possible to these determinations." *KCS Boss All., LLC v. United States*, 142 Fed. Cl. 368, 380 (2019) (citing *E.W. Bliss Co.*, 77 F.3d at 449). An agency's evaluation, however, must be consistent with the standards set forth in the solicitation. 10 U.S.C. § 2305; FAR 15.305(a). If an agency evaluates proposals based on unstated evaluation criteria, a protestor can challenge the award decision by showing: (1) the agency used a significantly different basis in evaluating its proposal than was disclosed and (2) the protestor has been prejudiced as a result, or in other words, that it had a substantial chance to receive the contract award but for the error. *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 387 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

1.      Technical Management Approach

Crowley poses three challenges to MSC's assignment of strengths to Patriot for its proposed Technical Management Approach: (i) strength sixteen, (ii) [* * *] individual strengths assigned for Patriot's proposed key personnel, and (iii) strength seventeen.

i.      *Strength Sixteen*

Crowley takes issue with MSC assigning Patriot strength sixteen, *see* Pl.'s MJAR at 8-9, which stated:

> [Patriot] is presently performing O&M for the WATSON class of ships and as described above, doing it well. Note that incumbent contractors have an advantage because they possess the most relevant past performance, and incumbent contractors with good performance records can offer real advantages to the government in terms of lessened performance risk. Such a competitive advantage is not an unfair or improper competitive advantage, and an agency is not required to attempt to equalize competition to compensate for that advantage. There is no basis to object to an incumbent offeror's advantage unless it is created by an improper preference or other unfair action by the procuring agency. This advantage is reflected in the key personnel's current experience and knowledge of [the WATSON] Class and MSC processes and procedures. It also affects past performance and risk analyses. Specifically, if awarded [Patriot] can seamlessly assume new contract performance from the predecessor contract performance.

AR 3716. By assigning this strength, Crowley argues that MSC "utilized Patriot's incumbency to create an unwarranted strength based upon how Patriot had performed on the incumbent contract" and employed unstated evaluation criteria by encompassing "past performance" and "transition" as criteria under the technical evaluation. Pl.'s MJAR at 8-9.

Crowley mischaracterizes MSC's considerations as employing unstated evaluation criteria. As Crowley acknowledges, *see* Pl.'s MJAR at 8, the solicitation expressly permitted MSC to consider the experience of an offeror's key personnel in the technical evaluation.[5] One area of interest for the government under the Technical Management Approach included "[t]he relevance and benefits of the proposed Key Personnel whose qualifications, experience, education, expertise, percentage of time they dedicate, and skill levels exceed contract requirements in relation to their assigned roles." AR 506. The solicitation further advised that an adjectival rating would be assigned for the Technical Factor in consideration of the offeror's proposed approach and understanding of the requirements and whether the risk of unsuccessful performance was low. AR 507. Based on the stated evaluation criteria, MSC was within its discretion to assign this strength to Patriot for its proposed key personnel's experience, the relevance of the experience, and the resulting benefits to the government. The key personnel proposed by Patriot are largely the same personnel presently performing "[a]O&M services on the WATSON Class. *See* AR 2995, 3011. Therefore, it was unavoidable that MSC would consider Patriot's incumbency when evaluating the "relevance and benefits" of Patriot's proposed key personnel, their "experience" with the WATSON Class ships and MSC processes and procedures, and the impact on "the risk of unsuccessful performance." The solicitation criteria permitted this consideration. *See Forestry Surveys & Data v. United States*, 44 Fed. Cl. 493, 499 (1999) (stating an agency has "great discretion in determining the scope of an evaluation factor"). While MSC cannot unduly tip the scales in favor of an incumbent contractor, it may weigh the advantages offered by the incumbent via its relevant experience and performance with the contract subject matter. *Gulf Grp.*, 56 Fed. Cl. at 398.

MSC was also within its discretion to determine that Patriot's prior performance and ability to seamlessly assume contract performance provided a benefit to the government. The stated areas of interest in the solicitation permitted MSC to consider "[a]ny other aspect in the offeror's technical management approach that will provide a benefit to the government[.]" AR 506. The stated areas of interest also permitted MSC to consider "[t]he feasibility [that] the offeror's technical management approach will facilitate operations and result in a successful coordination/collaboration effort with the [g]overnment in a timely and effective manner." *Id*. Furthermore, in assigning an adjectival rating, MSC was permitted to consider the risk of unsuccessful performance. *See* AR 507. Thus, while past performance and transition, as characterized by Crowley, are not explicitly identified as evaluation criteria under the Technical Management Approach, under the stated areas of interests, it was reasonable for MSC to consider Patriot's "good performance records" as part of its technical evaluation and determine that they "c[ould] offer real advantages to the government in terms of lessened performance risk." AR 3716; *see ARINC Eng'g Servs., LLC v. United States*, 77 Fed. Cl. 196, 203 n.9 (2007) ("[I]ncumbent contractors with good performance records can offer real advantages to the

---

[5] Crowley also benefitted from this consideration because MSC also credited Crowley for the experience of its proposed key personnel. *See* AR 3719-20.

government in terms of lessened performance risk; accordingly, proposal strengths flowing from [an offeror's] prior experience are proper considerations in selecting an awardee[.]") (citations omitted).

Aside from its consistency with the evaluation criteria, MSC's assignment of strength sixteen is supported by Patriot's proposal. In the Technical Management Approach portion of its proposal, Patriot stated that it intends to leverage its experience managing the same vessel class during the previous five-plus years and to scale up, improve, and refocus existing management practices to the new solicitation requirements. AR 2994-3005. Patriot's proposal lists the key principles that have contributed to Patriot's successful management of the WATSON Class, which Patriot states will continue, as well as the proposed tasks and objectives for meeting the new solicitation requirements. AR 2994-95. Thus, based on the record, MSC's assignment of strength sixteen was rational because it was consistent with the solicitation evaluation criteria and supported by Patriot's proposal.[6]

### ii.   [* * *] individual strengths assigned for proposed key personnel

Crowley also challenges MSC's assignment of [* * *] individual strengths to Patriot for each of its proposed incumbent personnel. Pl.'s MJAR at 11. To support its challenge, Crowley points to the following portion of MSC's Technical Management Approach comparison:

> If [Patriot] had not offered [* * *] incumbent personnel with present and seasoned WATSON Class experience, as shown by the above list of strengths for each, then [Crowley's] technical proposal would be slightly stronger than [Patriot's] proposal. Nonetheless, the incumbent personnel's experience provides the tipping point to make [Patriot's] technical proposal stronger. [Patriot's] incumbent personnel collectively reduce performance risk across the entire spectrum of performance in that the personnel are currently performing the RFP tasks. Thus, [Patriot's] proposal offers more benefit to the [g]overnment when its incumbent personnel are combined with [Patriot's] other strengths[.]

AR 3721-22. Crowley argues that assignment of these individual strengths was unreasonable because these strengths are based solely on Patriot's incumbency, are unearned, and reflect clear incumbent preference. Pl.'s MJAR at 11.

As explained above, the evaluation criteria in the solicitation permitted MSC to consider the qualifications, experience, and expertise of the proposed key personnel and any other aspects of the offeror's technical proposal that provide a benefit to the government, and to assign a

---

[6] Crowley also argues that MSC "presumed [Patriot would have a] risk-free transition based solely upon Patriot's incumbency." Pl.'s MJAR at 12. To the contrary, the record shows that MSC found "[Patriot's] *proposal* provided a better approach by increasing the likelihood of successful performance on this contract, without startup risks." AR 3723 (emphasis added). MSC's conclusion was based on Patriot's proposed approach, not "presumed" based on its incumbency. Further, MSC was rational to conclude that Patriot's proposed approach would not introduce "startup risks" because Patriot is the incumbent contractor currently performing the services and its proposal leveraged the benefits Patriot could provide due to its incumbent experience. MSC is not prohibited from considering advantages that incumbent offerors may provide. *See Gulf Grp.*, 56 Fed. Cl. at 398.

strength when MSC determined that a strength was warranted. *See* AR 506, 3938. The solicitation defined a "strength" as "an aspect of an offeror's proposal that has merit or exceeds specified performance or capability requirements in a way that will be advantageous to the [g]overnment during contract performance." AR 3925. The technical evaluation report issued by the PPET also stated that "strengths" are typically assigned for "high quality personnel, facilities, organizational structures[,] and/or technical approaches that allow an offeror to perform the work cost effectively or at a higher level of quality." AR 3339.

In assigning these individual strengths, MSC determined that Patriot's proposed key personnel with WATSON Class experience made Patriot's proposal "stronger" and provided a benefit to the government by "collectively reduc[ing] performance risk across the entire spectrum of performance." AR 3721-22. Patriot's proposal provided that "most of the shoreside and shipboard senior management proposed have been with the [WATSON] class program for much of the current contract." AR 2995; *see* AR 3011. While the advantage of employing personnel experienced with the specific solicitation subject matter may be "inherent" for any incumbent contractor, MSC is not required to neutralize the competitive advantages that incumbent contractors, such as Patriot, enjoy simply because of their own circumstances. *WinStar Commc'ns, Inc. v. United States*, 41 Fed. Cl. 748, 763 (1998). Further, the administrative record shows, and Crowley ignores, that MSC explained its rationale for why Patriot's technical proposal and its proposed incumbent personnel were determined to provide greater benefit to the government. In this regard, MSC stated:

> There are no weaknesses or deficiencies noted in the technical proposals submitted by [Patriot] or [Crowley]. Both offerors proposed many strengths in their technical management approaches that would benefit the government. [Crowley] proposed [* * *]. However, [Patriot] offered [* * *] personnel who possess prior WATSON LMSR O&M experience gained under the current WATSON O&M contract. The recent experience of [Patriot's] incumbent personnel, combined with [Patriot's] other strengths, makes [Patriot's] technical tradeoff proposal more beneficial to the [g]overnment than [Crowley's] proposal.

AR 3721. "The question is not whether the court would reach the same conclusions as the agency regarding the comparison of proposals, but, rather, whether the conclusions reached by the agency lacked a reasonable basis[.]" *Glenn Def. Marine*, 105 Fed. Cl. at 561. Here, MSC's assignment of [* * *] individual strengths to Patriot for its proposed incumbent key personnel and their directly relevant and recent experience was consistent with the solicitation evaluation criteria and had a reasonable basis.

### iii.    Strength Seventeen

Crowley's final challenge to MSC's evaluation of the technical management approach relates to strength seventeen. Pl.'s MJAR at 9. Strength seventeen stated:

> [Patriot] is presently performing O&M for the WATSON class of ships and has the inherent benefit of having trained crews already on each ship. This also benefits the [g]overnment by facilitating seamless and smooth operations, and we expect it will

result in a successful coordination/collaboration effort with the government, in a timely and effective manner.

AR 3716. Crowley argues that "[t]his is nothing more than a strength for incumbency in which MSC rewarded Patriot not for its proposed approach . . . but merely because Patriot had been successful in winning the predecessor contract[.]" Pl.'s MJAR at 9. Because only the incumbent could have its crew already on the ship, this strength, according to Crowley, "was not available to any other offeror." *Id.* at 10. This argument likewise fails because, not only does this strength explicitly reference and connect to the solicitation evaluation criteria, but it is also based on the contents of Patriot's proposal.

The solicitation permitted MSC to consider "[t]he feasibility [that] the offeror's technical management approach will facilitate operations and result in a *successful coordination/collaboration effort with the [g]overnment in a timely and effective manner*." AR 506 (emphasis added). Patriot's proposal stated that "most of the shoreside and shipboard senior management proposed have been with the [WATSON] class program for much of the current contract[,]" AR 2995, and "the crewmembers that will fill key positions on the next [WATSON] contract currently average 4-5 years of experience in those positions on the [WATSON] vessels[,]" AR 3011. Patriot also provided an extensive list of proposed key personnel in its proposal—a majority of whom are currently employed by Patriot for its incumbent contract performance. *See* AR 2990-93, 3066-162.

Considering Patriot's proposal against the evaluation criteria, MSC's assignment of strength seventeen is reasonably supported by the government's interest in a smooth transfer of ongoing operations from the incumbent contract to the new contract, and the benefits that the government would obtain from Patriot's proposed continued use of the "trained crews already on each ship." AR 3716. Further, just because this strength is "not available to any other offeror" does not render its assignment arbitrary or capricious. This strength directly correlates to the solicitation evaluation criteria and the contents of Patriot's proposal, and, within these parameters, MSC has broad discretion to determine that Patriot's proposed approach offers a real advantage over other proposals, and MSC is not required to neutralize this competitive advantage. *See One Largo Metro, LLC v. United States*, 109 Fed. Cl. 39, 74 (2013); *WinStar*, 41 Fed. Cl. at 763.

    2.    <u>Manning Approach</u>

Crowley poses three challenges to MSC's assignment of strengths to Patriot for its proposed manning approach: (i) strength one, (ii) strength three, and (iii) MSC's comparison of Crowley's and Patriot's respective manning approaches.

        i.    *Strength One*

MSC assigned strength one to Patriot for the following: "As the incumbent, [Patriot] has maintained a gapped billet rate of [* * *]." AR 3717. MSC determined that "[t]his demonstrates that the current manning methodologies, which [Patriot] intends to retain, are working in a very successful manner." *Id.* Crowley argues that, because Patriot's proposed manning approach did

10

not state its intention to retain the "manning methodologies" that resulted in this gapped billet[7] rate from the incumbent contract, MSC made an unsupported assumption based on Patriot's incumbent performance that Patriot would continue the same manning approach. Pl.'s MJAR at 10. The record, however, shows that MSC did not make any unsupported assumptions by assigning this strength.

When evaluating Patriot's proposed manning approach, the evaluation criteria permitted MSC to consider Patriot's "past success of programs to indicate potential for future success." AR 506. Patriot's proposed manning approach stated that Patriot "[* * *]." AR 3006. Patriot went on to describe in detail its approaches to [* * *]. *See* AR 3006-15. These manning approaches described by Patriot in its proposal appear to reflect the approaches that Patriot utilizes on its incumbent contract, as well as its intention to continue and improve its approaches as needed to meet the solicitation requirements. *See, e.g.,* AR 3007 ("[* * *]"); AR 3008 ("[* * *]"); AR 3011 ("[* * *]"); AR 3012 ("[* * *]"); AR 3013 ("[* * *]"); *id.* ("[* * *]"); AR 3008 ("[* * *]"). While Patriot does not explicitly state that it "intends to retain" the same gapped billet rate from the predecessor contract, the record shows that Patriot explicitly described how it planned to continue its current manning methodologies under the new contract, and MSC rationally assigned this strength to Patriot based on the evaluation criteria.

*ii.    Strength Three*

Crowley next challenges strength three assigned to Patriot. *See* Pl.'s MJAR at 10-11. Strength three stated:

> [Patriot] noted in its proposal that "most of the shoreside and shipboard senior management proposed have been with the [WATSON] class program for much of the current contract." Additionally, [Patriot] stated in regard[] to its port engineers that many "have been with the current MSC [WATSON] Class program since contract award in 2014." This will provide personnel at contract inception that are trained and receiving ongoing training on with [*sic*] MSC processes and/or WATSON Class technical specifics -- which ensures a ready level of technical proficiency, coupled with efficiency coming from familiarity when dealing with common issues as they arise. Put another way, it provides a greater systemic capability to reach back to recent issues that have occurred on the [WATSON] Class vessels and address them in a timelier manner.

AR 3717 (internal citations omitted). Crowley argues that MSC improperly credited Patriot because the portion of the strength that states "most of the shoreside and shipboard management proposed have been with the [WATSON] class program for much of the current contract" is contained in Patriot's technical management approach, not in the manning approach. Pl.'s MJAR at 10-11. Crowley further argues this strength was assigned "based on nothing more than [Patriot's] incumbent experience, unrelated to the evaluation criteria" and the strength does not reflect Patriot's proposed manning approaches or methods. *Id.* at 11.

---

[7] A "billet" can mean a specific personnel position, assignment, or duty station which may be filled by one person. The term "gapped billet" is the difference between billets authorized and the current personnel onboard.

Detrimental to this argument is the fact that the solicitation provides that the "entire Technical [F]actor will be evaluated as a single technical factor." AR 506. So, it was not unreasonable or improper for MSC to assign this strength to Patriot based on relevant information in Patriot's technical proposal irrespective of whether such information was included under the Technical Management Approach or Manning Approach. *Cf. Office Depot, Inc. v. United States*, 95 Fed. Cl. 517, 533 n.18 (2010) ("The general rule is that an agency is not precluded from considering an element of a proposal under more than one evaluation criterion where the element is relevant and reasonably related to each criterion under which it is considered.") (quotations omitted). Furthermore, for the manning approach, the evaluation criteria identified "retention" and "training" as areas of interest to the government. AR 506. As demonstrated by Patriot's proposal, and as discussed above, Patriot set forth in detail its current and planned approaches and methods for personnel recruitment, retention, and training. *See* AR 3008-15. Therefore, based on the solicitation evaluation criteria and Patriot's proposal, MSC was rational and within its discretion when it assigned this strength to Patriot.

*iii.    MSC's Manning Approach Comparison*

Crowley also challenges MSC's comparison of Crowley's and Patriot's respective manning approaches. MSC's comparison stated:

> [Crowley] and [Patriot] were both recognized for possessing several manning approach strengths. Against [Crowley's] advantage in number of strengths, we balanced [Patriot's] incumbent advantage of already manning the WATSON Class vessels and shore support establishment, and having done so successfully during the incumbent contract period. On balance, we believe that slightly outweighs [Crowley's] well-stated program.

AR 3723. Crowley argues that "Patriot's incumbent status was the deciding factor" in this comparison. Pl.'s MJAR at 13. The Court, however, is not persuaded that Patriot's incumbent status was the deciding factor. Instead, MSC's conclusion was consistent with the solicitation evaluation criteria and supported by Patriot's proposal.

The solicitation evaluation criteria stated that MSC had an interest in crew recruitment and retention, an offeror's past success with crew retention programs, and any other aspect of an offeror's manning approach that provided a benefit to the government. AR 506. Patriot's proposal included a detailed manning approach, which, not surprisingly, reflected various recruitment and retention approaches that it utilizes on the incumbent contract. AR 3006-15. Where an incumbent contractor's proposal exhibits its experience and resources naturally derived from performance on the incumbent contract, it may be difficult to distinguish the incumbent's advantages based solely on incumbent *status* from those advantages derived from performance on the incumbent contract. In this case, since Patriot leveraged its incumbent experience and resources throughout its proposed manning approach, MSC did not simply rely on Patriot's incumbent *status* as the deciding factor but instead credited Patriot for its inherent incumbent advantages as illustrated in its proposal, which naturally included "already manning the [WATSON] Class vessels and shore support establishment[.]" AR 3723. Under these circumstances, MSC is permitted to recognize the natural advantages that Patriot possesses and

12

conclude that Patriot's proposed manning approach provides greater benefit to the government than Crowley's proposed approach. *Omega World Travel*, 54 Fed. Cl. at 575; *see E.W. Bliss Co.*, 77 F.3d at 449; *Comput. Scis. Corp.*, 51 Fed. Cl. at 311; *see also Vantage Assocs., Inc. v. United States*, 59 Fed. Cl. 1, 19 (2003) ("The wide discretion afforded contracting officers extends to a broad range of procurement functions, including the determination of what constitutes an advantage over those proposals.").

### 3.    Other challenges to MSC's technical evaluation

Crowley also asserts that MSC improperly relied upon Patriot's incumbency when assessing risk in the trade-off analysis. *See* Pl.'s MJAR at 13-14. As part of the trade-off analysis, the SSAC assessed risk as a separate consideration from the technical, past performance, and price factors. *See* AR 3711-12. As part of this assessment, the SSAC considered "the degree to which an offeror's proposed approach to achieving the technical factor may involve risk of disruption of schedule, degradation of performance, the need for increased [g]overnment oversight, and/or the likelihood of unsuccessful contract performance." AR 3712. For Patriot, the SSAC determined:

> [Patriot] is the incumbent for this contract. Its present performance is overall well rated. Its past performance and known management, and management practices, minimize the known or anticipated performance risk factors.

AR 3717. Crowley argues that this determination is based on Patriot's incumbent status alone, as opposed to Patriot's proposed technical approach. Pl.'s MJAR at 13. While SSAC's determination does not explicitly reference Patriot's proposal, the definition of risk as set forth in SSAC's award recommendation involved an assessment of Patriot's "proposed approach," AR 3712, and Patriot's proposed approach was replete with direct references to its performance on the incumbent contract. *See* discussion *supra* section III.A.2.i; *see also* AR 2994 (discussing the key principles that have contributed to its success); AR 3040 ("While [Patriot] can draw recent and relevant examples of past performance from across its fleet contractor-operated MSC . . . vessels, no other contract would match the recency and relevancy of our 5+ years of performance successes with the [WATSON] Class LMSR contract."). Thus, SSAC's determination, as summarized in the risk portion of its award recommendation, is supported by Patriot's proposal, and the Court will not disturb its determination. *See Banknote*, 56 Fed. Cl. at 381 (stating that this Court is in no position to second-guess an agency's discretionary determinations that involve highly technical matters).

Crowley's last challenge to the technical evaluation is that MSC "ignored and downplayed multiple benefits of Crowley's technical proposal" in the Technical Management Approach comparison. Pl.'s MJAR at 14-15. To support its position, Crowley lists an array of purported benefits that it claims MSC failed to identify in its evaluation. *Id.* The Court, however, does not accept Crowley's invitation to second guess MSC's evaluation of Crowley's proposal and determine what aspects of Crowley's proposal would benefit the government. Rather, it is within MSC's broad discretion to determine which bid is the most advantageous to the government. *See Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 959 (Fed. Cir. 1993). Indeed, the record shows that MSC identified areas where Crowley's proposal provided a

benefit to the government. *See* AR 3719-21. Crowley's argument that MSC failed to give credit for other aspects of its proposal which *Crowley* considers beneficial to the government amounts to mere disagreement with MSC's technical evaluation and does not provide grounds for the Court to disturb it. *See Avtel Servs., Inc. v. United States*, 70 Fed. Cl. 173, 218 (2006) ("[A] protestor's mere disagreement with the agency's evaluation determination does not provide a basis for sustaining the protest.") (quotations omitted).

## B.     Past Performance Evaluation

To advance its underlying premise that MSC improperly favored preservation of the incumbent contractor, Crowley next challenges MSC's past performance evaluation on the grounds that MSC ignored the context of Crowley's and Patriot's past performance data in the Contractor Performance Assessment Reporting System ("CPARS"), unequally applied the solicitation evaluation criteria when determining the relevance of past performance efforts, and failed to consider past performance data that Crowley submitted with its proposal. Pl.'s MJAR at 16-32. In general, an agency is afforded very broad discretion when it determines whether and to what extent an offeror's past performances instill confidence that the offeror will successfully perform and meet the needs of the contracting agency. *Vectrus Sys. Corp. v. United States*, 154 Fed. Cl. 29, 41 (2021). An agency's past performance evaluation will not be disturbed unless it is unreasonable, inconsistent with the terms of the solicitation, or in violation of applicable statutes or regulations. *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 599 (2006); *see Al Andalus Gen. Conts. Co. v. United States*, 86 Fed. Cl. 252, 262 (2009); *see also Univ. Rsch. Co., LLC v. United States*, 65 Fed. Cl. 500, 506 (2005); *JWK Int'l Corp. v. United States*, 52 Fed. Cl. 650, 659 (2002). In this case, the record demonstrates that MSC's past performance evaluation was reasonable, consistent with the stated evaluation criteria, and compliant with applicable law, and, therefore, the Court will not disturb it.

### 1.     Evaluation of CPARS

Crowley argues that MSC's past performance evaluation was arbitrary and violated the FAR because it failed to consider the "context" of the offeror's past performance data. Pl.'s MJAR at 17, 19. FAR 15.305(a)(2)(i) sets forth requirements for how agencies should conduct past performance evaluations and, in relevant part, provides:

> Past performance information is one indicator of an offeror's ability to perform the contract successfully. The currency and relevance of the information, source of the information, context of the data, and general trends in contractor's performance shall be considered.

Crowley posits that the "context" of past performance data that is stored in the CPARS is found in the narratives that explain the circumstances of the offeror's performance. Pl.'s MJAR at 19. Therefore, Crowley argues that MSC is required by FAR 15.305(a)(2)(i) to review the CPARS narratives—not just the adjectival ratings—and that MSC failed to do so. *Id*. at 19-23.

The Court is not persuaded by Crowley's interpretation of FAR 15.305(a)(2)(i). This clause affords MSC considerable discretion in deciding what data is most relevant for the past

performance evaluation. *Seaborn Health Care, Inc. v. United States*, 101 Fed. Cl. 42, 51 (2011). It does not by its terms require MSC to review the CPARS narratives, nor does it require MSC to consider whether the CPARS narratives justify the corresponding adjectival ratings. Further, it does not mandate that "the context of the [past performance] data" be derived from the CPARS narratives. *See* FAR 15.305(a)(2)(i). Instead, it provides latitude to MSC to select a method for evaluating offerors' past performance. *See Vanguard Recovery Assistance v. United States*, 101 Fed. Cl. 765, 784 (2011) ("The deference owed to the procuring agency extends not just to the actual rating, but also to its selection of a method for evaluating offerors' past performance.") (internal quotations omitted). In this regard, the solicitation set forth the methods that MSC would use to evaluate past performance. AR 507. Similarly, the methods described in the solicitation likewise did not require MSC to use the CPARS narratives, and instead provided MSC discretion. *See id.* ("The [g]overnment *may* use data provided in the offeror's proposal . . . in addition to data obtained from other sources such as the Past Performance Information Retrieval System (PPIRS), CPARS, etc.") (emphasis added). Because neither the FAR nor the solicitation required MSC to review the CPARS narratives in conducting its past performance evaluation, Crowley's argument fails.[8]

Crowley further argues that MSC's past performance evaluation was arbitrary because MSC "failed to consider significant negative past performance information regarding Patriot's incumbent contract and 5301 contract."[9] Pl.'s MJAR at 23. Crowley asserts that, had MSC considered Patriot's CPARS narratives, MSC "would have concluded that Patriot's past performance did not warrant a rating of Substantial Confidence." *Id.* at 25. To support its argument, Crowley directs the Court to various excerpts in Patriot's CPARS narrative for the incumbent contract that it argues contain negative information about Patriot's past performance. *See* AR 3648 ("[* * *]"); AR 3649 ("[* * *]"); *id.* ("[* * *]"). However, in its argument, Crowley focuses only on the negative information contained in Patriot's CPARS narratives. *See* Pl.'s MJAR at 24. The fact that the narrative reflects that Patriot's past performance may have been imperfect does not render MSC's "Substantial Confidence" rating arbitrary. When viewed in full, the narratives explain how Patriot's performance improved and how Patriot was able to overcome the challenges. *See* AR 3647 ("[* * *]"); AR 3649 ("[* * *]"); *id.* ("[* * *]").

Regarding Patriot's 5301 contract, MSC acknowledged Patriot's "[* * *]" ratings and downward performance trend in its evaluation. AR 3520 ("[* * *]"); *id.* ("[* * *]"). In weighing its assessment of the 5301 contract against Patriot's overall past performance, MSC found this negative information was offset by the positive information on the more relevant incumbent contract. *Id.* In this regard, MSC articulated:

> The quality of the [o]fferor's contracts gives the government a high expectation the offeror will successfully perform the contract because quality ratings combined a mix of exceptional, very good, satisfactory[,] and marginal ratings. However, the weight given to [the incumbent contract] and [the 5301 contract] for quality ratings

---

[8] Although not required, the record shows that MSC did consider CPARS narratives, at least in part, in its past performance evaluation, including with respect to Crowley. *See* AR 3444-45, 3447, 3464; *see also* AR 3471, 3473.

[9] Patriot's 5301 contract was a government reference contract submitted by Patriot as part of its past performance proposal. The scope of this contract consisted of O&M of four large, medium-speed vessels for MSC. AR 3050.

were high and medium weight, because they were "very relevant" and "relevant[,]" respectively. The positive effects on the confidence ratings by the quality ratings of "[* * *]" on the very relevant [incumbent contract] more [than] offsets the weakening effects on the confidence rating by the [* * *] quality ratings received on the less relevant [5301 contract]. Thus, the evaluators assigned a low substantial confidence rating.

AR 3520-21, 3555. As shown above, and contrary to Crowley's contention, the record demonstrates that MSC considered Patriot's negative past performance information and weighed such information against other positive past performance information derived from Patriot's CPARS. The Court will not disturb MSC's past performance evaluation on these grounds.

Crowley's argument that MSC "ignored" the CPARS narrative for Crowley's ROCON contract is likewise unavailing. Pl.'s MJAR at 25. As stated above, MSC was not required by the FAR or the solicitation to review the CPARS narratives in its past performance evaluation. Further, the role of the Court is not to determine what MSC could have done in its evaluation; rather, it is to determine whether MSC had a rational basis for what it did. *Motor Vehicle Mfrs.*, 463 U.S. at 43. Here, MSC had a rational basis. In its overall confidence rating for Crowley, MSC articulated:

> Based upon the reference contracts; CDRs and USCG 835s, 2692s; and CPARS, in the [judgment] of the evaluators, the confidence rating for this offeror is **Satisfactory Confidence**. The [g]overnment has a reasonable expectation that the offeror will successfully perform the required effort because the contract provided by the offeror as a reference was evaluated as being recent and relevant with an associated high quality of performance. However, the [g]overnment could not conclude a higher confidence rating because the [ROCON] contract was evaluated as being the most relevant contract evaluated and the [ROCON] contract had [* * *] quality of performance, which in the judgment of the PPET does diminish the [government's] overall [confidence] rating[.]

AR 3447 (emphasis in original). The FAR defines a "[* * *]" rating as "[* * *]" and where "[* * *]." FAR 42.1503; *see* AR 3568. Given that Crowley received [* * *] ratings for its ROCON contract and that MSC determined that Crowley's ROCON contract was "the most relevant contract evaluated," MSC had a rational basis for assigning Crowley an overall "Satisfactory" confidence rating. Crowley's "mere disagreement" is not enough to disturb MSC's decision. *See Blackwater Lodge & Training Ctr., Inc. v. United States*, 86 Fed. Cl. 488, 514 (2009).

## 2.  Relevancy of Crowley's ROCON contract

In its proposal, Crowley submitted two past performance efforts—the BOBO contract[10] and the Hapag Lloyd contract—for evaluation by MSC. AR 2555-61, 3440-45. In addition to

---

[10] Crowley's BOBO contract was a government reference contract submitted by Crowley as part of its past performance proposal. The scope of this contract consisted of full ship management and operation of six vessels— five BOBO Class vessels and the USNS STOCKHAM—for MSC. AR 2555-57.

evaluating the submitted reference contracts, as part of the past performance evaluation, the solicitation provided:

> The Past Performance evaluation *will assess CPARS, if any had been completed, that did not correspond to a contract submitted by an offeror*. The Past Performance Evaluation Team (PPET) will review these CPARS contracts, *and their associated ratings, to determine whether each could affect the overall confidence ratings*. When the PPET determine[s] CPARS ratings for a contract could not affect the overall confidence rating, the contract will not be evaluated further. When the PPET determine[s] a CPARS contract could affect the overall confidence rating, *then relevance* will also [be] evaluated so the contract can be factored into the overall confidence rating.

AR 507 (emphasis added). After its initial evaluation, and consistent with the solicitation terms above, MSC identified a CPARS for another contract—the ROCON contract—that "did not correspond to a contract submitted" by Crowley. AR 3445-47; *see* AR 4631. Because Crowley had received "[* * *]" ratings on the ROCON contract, MSC determined that it "could affect [Crowley's] overall confidence ratings" and thus proceeded to determine its relevancy. AR 3445-46. Crowley argues that MSC acted irrationally when it determined that Crowley's ROCON contract was "Relevant" for the purposes of evaluating past performance. Pl.'s MJAR at 26.

The relevance of past performance information is a determination for the agency to make based on the evaluation criteria set forth in the solicitation. FAR 15.305(a)(2)(ii) ("The source selection authority shall determine the relevance of similar past performance information."). Under the adjectival rating system used in the instant solicitation, a contract would be deemed "Relevant" if the "[p]resent/past performance effort involved similar scope and magnitude of effort and complexities this solicitation requires." AR 508. The record shows that MSC first determined Crowley's ROCON contract to be "Very Relevant." AR 3445-46. However, in its FPR, Crowley explained its position that the ROCON contract was "Not Relevant," stating:

> [Crowley] did not submit a past performance data sheet for [the ROCON contract]. A business decision was made that this contract is not relevant in scope, magnitude, and complexity. The vessels on this contract are in Reduced Operating Status, three are steam ships, and the one that is gas turbine has a very rare and outdated Russian gas turbine engine. They are stateside, and normally only activated for sea trials.

AR 2562. In receipt of Crowley's position, MSC further assessed the differences between the ROCON contract and the solicitation requirements and concluded that the ROCON contract was "less relevant than was initially determined" but still "Relevant," contrary to Crowley's preferred rating of "Not Relevant." AR 3499-500. In reaching the conclusion, MSC explained as follows:

> First, [the ROCON] contract and the solicitation possess almost exactly the same mission, cargo type, contract length, contract terms and conditions. Second, the number of vessels and propulsion type are comparable with minor differences. However, operational tempo, five and one-year contract values are significantly different from the solicitation because the vessels were not operated in the same

type of ROS environment the [WATSON] vessels incur and the one-year contract value does not even equal half of the [WATON's] one-year value. In light of the significant differences (operational tempo, and contract value (five and one-year)) and minor differences (number of vessels, and propulsion type), the PPET could not conclude the contract involved essentially the same[] scope, magnitude and complexity this solicitation requires. Nonetheless, the contract operational tempo and contract values are the only areas that were significantly different from the solicitation. Every other area was very comparable and any differences were deemed minor. So while the PPET team could not say the contract involved essentially the same scope, complexity, and magnitude of effort; it was apparent all other contract characteristics indicated the contract involved similar scope, complexity and magnitude, which make it "Relevant."

AR 3546-47. As shown above, MSC's relevancy determination is based on the evaluation criteria in the solicitation and has a rational explanation. MSC's determination is afforded deference, and the Court will not second guess it. *See E.W. Bliss Co.*, 77 F.3d at 459; *Glenn Def. Marine (Asia), PTE Ltd. v. United States*, 720 F.3d 901, 911 (Fed. Cir. 2013) ("The [agency's] determination of relevance is owed deference as it is among the minutiae of the procurement, which this court will not second guess.") (quotations omitted).

### 3. Unequal treatment of Crowley's ROCON contract and Patriot's USNS MARTIN contract

Crowley argues that MSC treated it unequally by evaluating Crowley's ROCON contract and not evaluating Patriot's USNS MARTIN contract, which Crowley states is a contract for the same services on the same vessel for the same agency. Pl.'s MJAR at 26, 29. FAR 1.102-2(c)(3) requires impartial and fair treatment to all government contractors. "Equal treatment, however, does not require that all proposals be treated the same." *Mil-Mar Century Corp. v. United States*, 111 Fed. Cl. 508, 530 (2013). To prevail on a claim for unequal treatment, a bid protestor must show that the instance of unequal treatment was prejudicial. *WellPoint Mil. Care Corp. v. United States*, 953 F.3d 1373, 1378 (Fed. Cir. 2020); *see also Office Design Grp. v. United States*, 951 F.3d 1366, 1372 (Fed. Cir. 2020).

The solicitation stated that MSC would assess completed CPARS for contracts that did not correspond to a contract submitted by an offeror in its past performance proposal when MSC determined that the CPARS rating for the undisclosed contract "could affect the [offeror's] overall confidence ratings." AR 507. If MSC determined that the CPARS ratings could not affect the offeror's overall confidence ratings, then "the contract [would] not be evaluated further." *Id.* As explained earlier, MSC rationally determined that Crowley's ROCON contract could affect Crowley's overall confidence rating because Crowley received a "[* * *]" rating. AR 3445. As a result, MSC continued its evaluation of Crowley's performance on the ROCON contract. Similar to Crowley and its ROCON contract, Patriot did not submit its USNS MARTIN contract as part of its past performance proposal. *See* AR 2909, 3518-20. However, unlike Crowley on its ROCON contract, Patriot received a "[* * *]" rating for its USNS MARTIN contract. AR 4679. It follows that, based on the terms of the solicitation, had MSC identified Patriot's USNS MARTIN contract as part of its past performance evaluation, MSC could have decided not to

further evaluate Patriot's USNS MARTIN contract because Patriot had received a "[* * *]" rating, and, thus, MSC could reasonably conclude that the contract could not affect Patriot's overall confidence rating. Taken a step further, even if MSC had decided to proceed with evaluating Patriot's USNS MARTIN contract, it still would not have changed the outcome because Patriot's "[* * *]" rating would not have detrimentally affected Patriot's overall "Substantial Confidence" rating. AR 3466. Under these circumstances, Crowley cannot show the requisite prejudice to succeed on its unequal treatment claim. *WellPoint Mil. Care*, 953 F.3d at 1378 ("To prevail, [the protestor] must show that [the] instance of unequal treatment was prejudicial.") (internal citations omitted).

### 4.   Crowley's Hapag Lloyd contract

Crowley argues MSC violated the terms of the solicitation and FAR 15.305(a)(2)(ii) by ignoring its "directly relevant past performance" under its Hapag Lloyd contract, a commercial contract which Crowley submitted as part of its past performance proposal. Pl.'s MJAR at 31. Crowley asserts that the solicitation did not require submission of a completed past performance questionnaire ("PPQ") from Crowley's reference for the Hapag Lloyd contract as a prerequisite for MSC to consider the quality of its Hapag Lloyd contract. *Id.* at 32. According to Crowley, even in the absence of a completed PPQ, the solicitation *required* MSC to consider information that Crowley submitted regarding the quality of its performance under the Hapag Lloyd contract. *Id.* at 31-32.

The solicitation instructed offerors to "provide up to five [g]overnment reference contracts that are on-going or have been completed within five years . . . that demonstrate[] its experience successfully operating ship(s) similar to the ship(s) described in [the solicitation]." AR 499. If the offeror did not have a government reference contract available, commercial contracts could be used. AR 500. However, the solicitation cautioned that "government contracts would be deemed more relevant" than commercial contracts. *Id.* Offerors were instructed to include a past performance narrative that "specifically address[ed] how the referenced contracts reflect quality performance pertinent to the solicitation requirements[.]" *Id.* The solicitation also stated that "offerors shall provide a point of contact and the contact's email and phone number" for each past performance reference. *Id.*

For the past performance evaluation, the solicitation provided that "[t]he [g]overnment *may* use data provided in the offeror's proposal . . . in addition to data obtained from other sources such as the Past Performance Information Retrieval System (PPIRS), CPARS, etc." AR 507 (emphasis added). It further provided that MSC "*may* contact references provided in offeror's submitted narratives . . . to request information to determine the quality of [the] [o]fferor's performance." *Id.* (emphasis added). In assigning past performance ratings, the solicitation stated "[t]he evaluation of past performance will review the recency, relevancy, and quality of the offeror's performance[.]" AR 508.

Based on the record, MSC determined that Crowley's Hapag Lloyd contract was relevant and recent; however, MSC was ultimately unable to determine the quality of Crowley's performance. AR 3547. Because the Hapag Lloyd contract was a commercial contract, MSC could not obtain data from the government's CPARS system to verify the quality of performance

19

independently. *See* AR 3442 ("[The Hapag Lloyd contract] is a commercial contract and does not get reported in the [g]overnment's CPARS system."). Indeed, MSC could have relied on Crowley's past performance narrative but instead determined that "[i]n the absence of available CPARS reports" it relies on PPQs that are provided by the offeror's references to determine the quality of contract performance. *See id.* Since MSC did not receive a completed PPQ for the Hapag Lloyd contract, MSC concluded:

> No quality information is available for [the Hapag Lloyd contract]. [Crowley's] point of contact for the reference did not complete the past performance questionnaire that was provided. Therefore, it could not be evaluated by the PPET for quality.

AR 3547. While the solicitation required Crowley to submit a narrative addressing the quality of its performance under the Hapag Lloyd contract, the solicitation did not explicitly require MSC to use that information to determine the quality of Crowley's performance—whether a PPQ was submitted or not. *See* AR 507. To the contrary, the solicitation permitted MSC, at its discretion, to use information from various sources when evaluating past performance. *See* AR 507 ("The [g]overnment *may* use data provided in the offeror's proposal . . . *in addition to* data obtained from other sources[.]") (emphasis added).

Furthermore, contrary to Crowley's contention, FAR 15.305(a)(2)(ii) does not require that MSC consider information provided in Crowley's past performance narrative to determine the quality of its performance. *See* Pl.'s MJAR at 31-32. FAR 15.305(a)(2)(ii) requires that the solicitation "authorize offerors to provide information on problems encountered on the identified contracts and the offeror['s] corrective actions" and generally states that "[t]he [g]overnment shall consider this information, as well as information obtained from any other sources, when evaluating . . . past performance." In this instance, MSC was not considering any problems encountered on the Hapag Lloyd contract or corrective actions undertaken by Crowley, so the specific type of information referenced in the cited FAR clause was not at issue. MSC simply determined that it could not evaluate the Hapag Lloyd contract for quality because it was missing certain information from other sources, namely a completed PPQ from the Hapag Lloyd contract reference. MSC acted within its discretion, and not in violation of the FAR, when it determined that a completed PPQ from Hapag Lloyd was needed to effectively evaluate the quality of Crowley's contract performance.

## C.   Discussions regarding Crowley's Hapag Lloyd contract

For Crowley's last challenge, it argues MSC engaged in misleading and inadequate discussions because MSC failed to inform Crowley that it had to contact and retrieve a completed PPQ for the Hapag Lloyd contract as a prerequisite for MSC to consider the quality of the contract. Pl.'s MJAR at 33-36. In doing so, Crowley argues MSC violated FAR 15.306(d)(3) by failing to alert Crowley to a "significant weakness" or "deficiency" in its proposal. *Id.* at 33-34. Based on the record, however, the Court finds that MSC's discussions were not misleading or inadequate and were consistent with the FAR requirements.

FAR 15.306(d)(3) requires the agency to discuss "deficiencies, significant weaknesses, and adverse past performance information to which the offeror has not yet had an opportunity to respond." In this instance, the record shows that MSC alerted Crowley to the deficiency at issue. In its first discussion letter, MSC informed Crowley that its reference for the Hapag Lloyd contract "did not complete the past performance questionnaire that was provided" to the referenced contract point of contact ("POC"). AR 3686. Crowley responded by informing MSC that it "w[ould] reach out to Hapag Lloyd to uncover this deficiency and correct this for FPR submission." AR 3494. Crowley subsequently provided MSC with a new POC for its Hapag Lloyd contract as part of its FPR submission. AR 2558. Despite Crowley's efforts to remedy this deficiency, MSC still did not receive a PPQ from Crowley's Hapag Lloyd contact. AR 3494. In its second discussion letter, MSC informed Crowley again that it had not received a completed PPQ for the Hapag Lloyd contract. AR 3690. Crowley responded by stating that it had "reached out to Hapag Lloyd and confirmed that [its] referenced contract POC . . . is correct and will complete the [PPQ]." AR 3543-44. Ultimately, however, MSC never received a completed PPQ for the Hapag Lloyd contract. AR 3544, 3547.

 In negotiated procurements, "the agency must provide 'meaningful' discussions that are not misleading." *Greenland Contractors I/S v. United States*, 131 Fed. Cl. 216, 225 (2017). In this instance, the discussions between MSC and Crowley were not misleading. Rather, these discussions directly informed Crowley—not once, but twice—that MSC had not received a completed PPQ for its Hapag Lloyd contract. *See Poplar Point RBBR, LLC v. United States*, 147 Fed. Cl. 201, 224-25 (2020) ("To conduct meaningful discussions, the agency must point out weaknesses or deficiencies in a proposal as specifically as practical considerations permit so that the agency leads the offeror into areas of its proposal which require amplification or correction.") (quotations omitted); *see also Advanced Data Concept, Inc. v. United States*, 43 Fed. Cl. 410, 422 (1999), *aff'd*, 216 F.3d 1054 (Fed. Cir. 2000). FAR 15.306(d)(3) does not require MSC to explain the steps needed to resolve the deficiency or to advise Crowley of the adverse effects for a deficiency. *See Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl.  325, 343 (2009) ("[A]n agency is not required to 'spoon-feed' offerors in order to have meaningful discussions."). MSC need only accurately identify the weaknesses and deficiencies contained in the offeror's proposal—which it did. *See Dynacs Eng'g Co., Inc. v. United States*, 48 Fed. Cl. 124, 131 (2000) ("To be meaningful, discussions must include sufficient information as to the areas in which the offerors' proposals are believed to be weak so that the offerors have a reasonable opportunity to address those areas of weakness which could have a competitive impact.") (internal brackets and quotations omitted). Furthermore, the record shows that Crowley communicated to MSC that it was in contact with Hapag Lloyd to address the deficiency, and, thus, it was reasonable for MSC to conclude that Crowley had been given adequate notice of the deficiency and that Crowley had assumed the responsibility to remedy the deficiency—whether it was ultimately remedied or not. Under these circumstances, the Court finds that MSC satisfied its obligations to Crowley under FAR 15.306(d)(3).

## IV.   CONCLUSION

An incumbency advantage may be improper in circumstances where there is a disparity of access to information, there is evidence of preferential treatment or other improper action by

the agency, or the competitive advantage is by reason of government action as opposed to the result of the incumbent's own circumstances. *See, e.g., Sys. Plus, Inc. v. United States*, 69 Fed. Cl. 757, 772 (2006); *Oak Grove Techs., LLC v. United States*, 155 Fed. Cl. 84, 115 (2021); *WinStar*, 41 Fed. Cl. at 763; *see also Bd. of Regents of Nev. Sys. of Higher Educ. v. United States*, 132 Fed. Cl. 435, 458 (2017). Based on an examination of the record in this case, Crowley has failed to demonstrate that MSC improperly favored Patriot due to its incumbent status or that MSC's proposal evaluation and award decision was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

      For the reasons stated above, Crowley's motion for judgment on the administrative record is **DENIED**, and the government's and Patriot's respective cross-motions are **GRANTED**. The Clerk is **DIRECTED** to enter judgment accordingly.

      **IT IS SO ORDERED.**

                            s/ Thompson M. Dietz
                            THOMPSON M. DIETZ, Judge